**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 93-2792
_____

JESSE DEWAYNE JACOBS,

Petitioner-Appellant,

VERSUS

WAYNE SCOTT, Director,
Texas Department of Criminal Justice,
Institutional Division,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Texas
_____

(September 1, 1994)

Before GARWOOD, SMITH, and DeMOSS, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Jesse Jacobs was convicted and sentenced to death for the murder of Etta Urdiales, the young mother of two children. When Jacobs's sister was later tried for the same killing, the state changed its position, claiming that Jacobs's sister, not Jacobs, fired the bullet that killed the victim. Jacobs now seeks federal habeas corpus relief from his conviction and death sentence. The federal district court denied Jacobs's petition for writ of habeas corpus and denied a certificate of probable cause ("CPC") to appeal. Concluding that Jacobs has not made a substantial showing

of the denial of a federal right, we deny CPC.[1]

I.

A.

Jacobs moved from Illinois to Texas in 1983 while on parole for the murder of a retarded man.  A Texas parole officer supervised Jacobs from December 1983 through February 1986.  Jacobs became romantically involved with a fourteen-year-old girl named Lisa Chisholm, who gave birth to his child.

Bobbie Hogan, Jacobs's sister, had also moved to Texas and began seeing a man named Michael Urdiales, who was married to Etta Urdiales, the murder victim.  By 1986, Michael Urdiales and the victim were in the process of getting a divorce; each bitterly disputed the custody of their two children.

Chisholm's parents eventually signed a complaint against Jacobs, who was arrested for inducement of a minor.  Hogan posted a bond for Jacobs's release pending trial.  On February 21, 1986, soon after Jacobs was released, the victim was discovered missing from her apartment in Conroe, Texas.  Police officers searched the victim's apartment, finding blood splattered all over the bedroom and bathroom.  Subsequent chemical analysis of these stains matched them with the victim's blood type.  The police found that the victim's car was missing and that a stolen pickup had been left near her apartment.  Her body was not discovered until September 1986.

---

[1] Although we consider this case on application for CPC, we have received full briefing of the issues and have heard oral argument.

After the victim's disappearance, Jacobs and an accomplice went on an extended crime spree.[2]  On September 9, 1986, Jacobs was finally arrested for car theft in Hudspeth, Texas.  Police asked Jacobs about the disappearance of Etta Urdiales.  Jacobs told them, and later the district attorney, that he would tell them what they wanted to know if he would be allowed to see Chisholm and if the district attorney would seek the death penalty.  Jacobs's requests were met.[3]

Jacobs told the police that soon after his release from jail, he went to the victim's apartment, struck her on the head, abducted her, and drove her to a clearing in the woods.  She was still "dizzy" when they arrived in the woods.  He took a sleeping bag from her car and put it on the ground for her to sit on, then grabbed her left hand and shot her in the left side of the head with a .38 caliber revolver.

Jacobs took the police to the victim's gravesite, a small clearing in a wooded area in southern Montgomery County, and pointed out an area of the ground covered with pine needles and limbs.  After excavating the area, the police found a blue sleeping bag containing the remains of the victim, whose body was in the same position as Jacobs had described:  face down with her head

[2] During the intervening months between the killing and Jacobs's apprehension in September, he and an accomplice (1) abducted a woman in a grocery parking lot and attempted to use her ATM card to get money; (2) robbed three fast food restaurants at gunpoint; and (3) abducted a man outside a drugstore.  After Jacobs robbed another fast food outlet in Oklahoma, he participated in a shootout with local police.  His accomplice was wounded and captured, but he escaped.

[3] Jacobs was allowed to meet with Chisholm, and the prosecutor sought the death penalty.  Jacobs told the district attorney that his motivation in seeking the death penalty was to avoid spending the rest of his life in prison.

pointed southeast.  An autopsy showed that her death was caused by a gunshot wound to her left temple and that there was a tear in another part of her scalp.

### B.

At trial, Jacobs changed his story.  He testified that after having been released from jail, he called Hogan to tell her that he was fleeing the state.  He met with her in a parking lot and agreed to help his sister "deal with" the victim.  According to Jacobs, he thought Hogan merely wanted to scare the victim into giving custody of her children to Michael Urdiales.

Jacobs testified that his motorcycle had been stolen, and so he stole a pickup truck the next day.  He testified that he waited outside Etta Urdiales's apartment, abducted her, drove her to the woods, tied her up, blindfolded her, placed her in a sleeping bag in a tent he had erected, and then left to return her car to her apartment.  Seeing police outside the apartment, he parked her car in a parking lot one-half mile away.

He telephoned Hogan.  Both he and Hogan went back to the woods.  Then, Jacobs testified, he told Hogan to go to a nearby abandoned house.  Jacobs untied Urdiales, took her to the house, and made her sit on a bed.  He went outside and sat on the porch.

Jacobs testified that he heard a shot and then saw Hogan with a gun.  Hogan told him that she did not mean to kill Etta Urdiales. Jacobs took the gun, told Hogan to go home, and said he would take care of things.  According to this version of events, Jacobs buried

**4**

the victim's body but did not actually kill her.

## C.

Chisholm visited Jacobs while he was being held in the county jail pending trial.  During Chisholm's first visit, Jacobs admitted that he killed the victim.  Jacobs later wrote Chisholm a letter admitting that he killed the victim "for the love of a sister."  On September 29, 1986, Jacobs escaped from jail but was apprehended twenty hours later.

## II.

## A.

Jacobs was indicted in Texas state court for the capital murder of Etta Urdiales during the course of committing or attempting to commit a kidnapping.  He pleaded not guilty.  During the trial, he testified that Hogan, not he, had killed the victim.

The prosecution showed the jury a videotape of Jacobs's confession.  The jury was instructed that it could return a guilty verdict if it found beyond a reasonable doubt that Jacobs had intentionally killed the victim or that Jacobs was guilty under the Texas "law of parties," which provides that a defendant is responsible for certain actions of his co-conspirator.  TEX. PENAL CODE ANN. § 7.02(b) (Vernon 1994).  The jury found Jacobs guilty of capital murder.

B.

At the punishment phase of the trial, the court gave the jury two questions, or "special issues," required by Texas law to be asked of the jury before the death penalty can be imposed. The special issues were:

> Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result?

> Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

See TEX. CODE CRIM. PROC. ANN. art. 37.071(e).[4] The jury answered "yes" to both special issues, and Jacobs was given a death sentence. During the punishment hearing, evidence had been elicited regarding Jacobs's other criminal conduct, including the Illinois murder.[5]

---

[4] At that time, the Texas statute read:

> (b)   On conclusion of the presentation of the evidence, the court shall submit the following three issues to the jury:

> (1)   whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

> (2)   whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

> (3)   if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

The third question was not relevant in this case and was not submitted to the jury.

[5] In 1973, Jacobs had been convicted in Illinois for murder, for which he received a 25-50-year sentence. In 1977, Jacobs had been convicted of attempted escape from the Illinois penitentiary, for which he received an 18-year sentence. In 1967, Jacobs was convicted of burglary, for which he received probation. In

**6**

C.

Several months after Jacobs was convicted, his sister, Bobbie Hogan, was tried and convicted of involuntary manslaughter in connection with the killing of Etta Urdiales. Hogan was prosecuted by the same attorney who prosecuted Jacobs. During Hogan's trial, the prosecutor said that the state had been wrong in taking the position in Jacobs's trial that Jacobs had done the actual killing. The prosecutor stated that, after further investigation, he had determined that Hogan, not Jacobs, had killed the victim.[6] The prosecution maintained that Jacobs did not know that Hogan had a gun.[7] The state called Jacobs as a witness to testify that Hogan shot the victim.

---

1964, while a juvenile, Jacobs was placed on probation for his theft of five cars, two motorcycles, and three bicycles. He escaped from the juvenile detention facility, stole another vehicle, and was placed in a youth correction center. In addition, evidence was presented of various crimes that Jacobs committed between the victim's murder and his apprehension.

[6] At Jacobs's trial, the state had argued to the jury that "[t]he simple fact of the matter is that Jesse Jacobs and Jesse Jacobs alone killed Etta Ann Urdiales." But at the sister's trial, the prosecutor told the jury that, after further investigation, the prosecutor now believed that Jacobs did not killed the victim:

> But through the course of it all I changed my mind about what actually happened. And I'm convinced that Bobbie Hogan is the one who pulled the trigger. And I'm convinced that Jesse Jacobs is telling the truth when he says that Bobbie Hogan is the one that pulled the trigger.

The state told the jury that the evidence revealed by the investigation cast doubt on Jacobs's conviction.

The state told the jury that Jacobs's pretrial confession was full of "holes" and that it had verified that certain portions were completely "nontrue." Various police officers who investigated the case also testified that parts of the confession were false.

[7] The state also claimed that Jacobs was telling the truth when he testified that he did not in any way anticipate that the victim would be shot.

Jacobs's case was automatically appealed to the Texas Court of Criminal Appeals, which affirmed his conviction and sentence. Jacobs v. State, 787 S.W.2d 397 (Tex. Crim. App. 1990). Jacobs did not seek rehearing, informing the trial court that he wished to forego further appeals. The court scheduled Jacobs to be executed on June 22, 1990. Later, Jacobs told the court that he had changed his mind and did wish to seek further appeals. The execution date was rescheduled, and certiorari was denied. Jacobs v. Texas, 498 U.S. 882 (1990).

Jacobs filed a habeas petition in the state trial court. That court recommended that relief be denied and forwarded the writ to the Court of Criminal Appeals, which denied the writ and denied rehearing. Ex parte Jacobs, 843 S.W.2d 517 (Tex. Crim. App. 1992). Jacobs's petition for certiorari was denied. Jacobs v. Texas, 113 S. Ct. 3046 (1993).

Jacobs filed a habeas petition and an application for stay of execution in federal district court, which denied the petition and denied CPC. Jacobs v. Collins, No. H-93-2454 (S.D. Tex. 1993). The appeal of the district court's decision is before us.

### III.

We first must decide whether to grant CPC, for unless CPC is granted, we lack jurisdiction to hear this appeal.[8] Black v.

---

[8] As a threshold matter, Jacobs notes that in Texas ex rel. Holmes v. Honorable Court of Appeals for the Third District, No. 71,764, 1994 Tex. Crim. App. LEXIS 52 (Tex. Crim. App. Apr. 20, 1994), the court held for the first time

**8**

<u>Collins</u>, 962 F.2d 394, 398 (5th Cir.), <u>cert. denied</u>, 112 S. Ct. 2983 (1992).  Under FED. R. APP. P. 22(b), the standard for granting a CPC is whether the defendant has made "a substantial showing of the denial of a federal right."  <u>Black</u>, 962 F.2d at 398 (citing <u>Barefoot v. Estelle</u>, 463 U.S. 880, 893 (1983)).  He must "demon-strate that the issues are debatable among jurists of reason; that a court <u>could</u> resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further."  <u>Barefoot</u>, 463 U.S. at 893 n.4 (citations and internal quotations omitted).  Although in a capital case the court may properly consider the nature of the penalty in deciding whether to grant CPC, this alone does not suffice to justify issuing a certificate.  <u>Barefoot</u>, 463 U.S. at 893; <u>Black</u>, 962 F.2d at 399. As discussed below, none of the arguments advanced by Jacobs amounts to a substantial showing of a denial of a federal right.


IV.

Jacobs challenges his conviction and death penalty sentence because of the state's concession at Hogan's trial that Jacobs was not the triggerman.  Jacobs argues that he is innocent of capital murder, that he is "innocent of the death penalty" in the sense of

---

that the state habeas corpus procedure is available to a convicted murderer who alleges his innocence on the basis of newly discovered evidence.  According to Jacobs, comity requires that this court first allow him to exhaust this newly-created state court remedy.  We disagree.  Jacobs's claim does not turn on newly discovered evidence, but on the state's "concession" during Hogan's trial.  Any attempt by Jacobs to avail himself of the new procedure would be frivolous.  We are not required to dismiss a federal habeas petition in order to allow a defendant to pursue a frivolous state claim.

being ineligible for it, and that he was convicted and sentenced to death on the basis of evidence that has been revealed to be materially inaccurate. We deal with each of these arguments in turn.

A.

Jacobs argues that he is innocent of capital murder because the state's post-trial concessions show that he did not reasonably anticipate the victim's death. Under Texas law, Jacobs could be convicted of capital murder if either (1) he intentionally caused the death of the victim, TEX. PENAL CODE ANN. §§ 19.02(a), 19.03(a), or (2) the death of the victim "should have been anticipated" by him under the doctrine of the "law of the parties." TEX. PENAL CODE ANN. § 7.02(b).[9]

Jacobs testified at his trial and at Hogan's trial that he gave the gun to Hogan several days before the kidnapping but did not realize that Hogan had the gun with her on the day of the kidnapping. Jacobs argues on appeal that his testimony at Hogan's trial and the prosecutor's endorsement of his testimony show that he did not intentionally cause the death of the victim or antici-pate the killing.

_____

[9] Section 7.02(b) provides:

If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

TEX. PENAL CODE ANN. § 7.02(b) (Vernon 1994).

10

We do not consider the statements of the state prosecutor at Bobbie Hogan's trial to be newly discovered evidence.  Nor do we consider Jacobs's testimony at Hogan's trial, which was substantially the same as Jacobs's testimony at his own trial, to be new evidence.[10]  Even if we were to consider Jacobs's testimony or the prosecutor's statements to be new evidence, it is the law of this circuit that "the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus."  Boyd v. Puckett, 905 F.2d 895, 896-97 (5th Cir.), cert. denied, 498 U.S. 988 (1990).  Thus, we reject Jacobs's argument.

The Court held in Herrera v. Collins, 113 S. Ct. 853, 860 (1993), that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."  The Court went on to state the following:

> We may assume, for the sake of argument in deciding this case, that in a capital case a truly persuasive demonstration of "actual innocence" made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim.  But because of the very disruptive effect that entertaining claims of actual innocence would have on the need for finality in capital cases, and the enormous burden that having to retry cases based on often stale evidence would place on the States, the threshold showing for such an assumed right would necessarily be extraordinarily high.

---

[10] Jacobs also claims that evidence at Hogan's trial of a piece of a mattress containing a small hole supports his second version of events placing the blame for the killing on Hogan.

Id. at 869.  The Court concluded that post-trial affidavits to the effect that Herrera's brother committed the crime did not meet Herrera's "extraordinarily high" burden of proof.  Id. at 869-70.

The Court did not reach the issue of whether a defendant on death row can be executed if he can show that he is "actually innocent."[11]  Thus, Herrera does not affect the precedential value of Boyd.  We need not engage in the Court's hypothetical analysis of whether the defendant has made a "truly persuasive demonstration of `actual innocence.'"  As Justice Scalia wrote in his concurrence in Herrera,

> A number of Courts of Appeals have hitherto held, largely in reliance on our unelaborated statement in Townsend v. Sain, 372 U.S. 293, 317 . . . (1963), that newly discovered evidence relevant only to a state prisoner's guilt or innocence is not a basis for federal habeas corpus relief.  See, e.g., Boyd v. Puckett [905 F.2d at 896-97, other citations omitted].  I do not understand it to be the import of today's decision that those holdings are to be replaced with a strange regime that assumes permanently, though only "arguendo," that a constitutional right exists, and expends substantial judicial resources on the assumption.  The Court's extensive and scholarly discussion of the question presented in the present case does nothing but support our statement in Townsend, and strengthen the validity of the holdings based upon it.

Id. at 875 (Scalia, J., concurring).


B.

Jacobs, relying upon Sawyer v. Whitley, 112 S. Ct. 2514 (1992), argues that he is innocent of the death penalty.  At the time of Jacobs's conviction, the death penalty could be imposed

---

[11] See Herrera, 113 S. Ct. at 871-72 (O'Conner, J., concurring) ("Resolving the issue [of whether an exceptionally strong showing of actual innocence should negate a death sentence] is neither necessary nor advisable in this case.").

**12**

only if "the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result."  TEX. CODE CRIM. PROC. ANN. art. 37.071(e).  Jacobs argues that if Hogan killed the victim, as the prosecution claimed at Hogan's trial, then Jacobs did not engage in conduct causing the death of the victim.  Jacobs also argues that if, as the prosecution stated at Hogan's trial, he did not know Hogan had a gun, he did not reasonably expect that Hogan would die as a result of his conduct.

A petitioner bringing a successive, abusive, or defaulted federal habeas claim may have a federal court reach the merits of his claim if he is "actually innocent."  In <u>Sawyer</u>, the Court held that to show "`actual innocence' one must show by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law."  112 S. Ct. at 2517.  There is no independent constitutional error.  Therefore, the "reasonable juror" standard articulated in <u>Sawyer</u> is not applicable.

Jacobs urges that this claim must be remanded for consideration by the federal district court because that court failed to address his <u>Sawyer</u> claim when it considered his federal habeas petition.  We disagree.  The district court rejected Jacob's claim by implication when it rejected Jacobs's argument under <u>Herrera</u>.

C.

Jacobs argues that he deserves a retrial, citing <u>Johnson v. Mississippi</u>, 486 U.S. 578 (1988). The defendant in <u>Johnson</u> was sentenced to death under Mississippi law, under which the death penalty is imposed only if the jury finds that certain aggravating circumstances outweigh the mitigating circumstances. <u>Id.</u> at 581. The jury found the following aggravating circumstances: that the defendant had previously been convicted of a violent felony, that the defendant had committed capital murder for the purpose of avoiding arrest or escaping from custody, and that the capital murder was especially heinous, atrocious and cruel. <u>Id.</u> at 581 n. 1. The sole evidence supporting the aggravating circumstance that the defendant had previously been convicted of a violent felony was a document showing that he had been convicted in New York of the crime of second-degree assault with intent to commit first-degree rape. <u>Id.</u> at 581.

The jury found that the three aggravating circumstances outweighed the mitigating circumstances. The death penalty was imposed. After trial, a state appeals court vacated the previous felony conviction. Because the defendant's death sentence had been based in part upon a reversed conviction, the Court remanded to the Mississippi Supreme Court. <u>Id.</u> at 585.

Jacobs argues that <u>Johnson</u> requires that he be given a new trial. We disagree. In <u>Johnson</u>, the jury imposed the death penalty on the basis of a conviction that was later vacated. In Jacobs's case, the jury heard Jacobs testify that, contrary to his

**14**

pretrial statement, he did not kill the victim.  The jury disbe-
lieved this trial testimony.  It is not for us to say that the jury
erred in this credibility determination.

V.

Jacobs argues that the state violated the Eighth and Four-
teenth Amendments by continuing to take the position, after Hogan's
trial, that Jacobs had shot the victim, was guilty of capital
murder, and was eligible for the death penalty.  For example,
Jacobs points to the state's brief before the Texas Court of
Criminals Appeals, claiming that Jacobs's pretrial statement that
he shot the victim was true.[12]

Although we agree that the state's brief on direct appeal
appears to contradict its statements to the jury during the Hogan
trial, we have found no authority, and Jacobs has cited none, that
the state's contradictory statements amount to federal constitu-
tional error.  Jacobs has failed to prove facts that would entitle
him to relief under established constitutional principles.  Thus,
Jacobs seeks the benefit of a "new" rule of constitutional law and
is not entitled to relief.  See Teague v. Lane, 489 U.S. 288, 307

---

[12] On the direct appeal to the Court of Criminal Appeals, one of the issues
raised by Jacobs was the voluntariness of his confession.  The state's brief,
dated March 10, 1989, recounted Jacobs's pretrial confession as follows:

Appellant led officers directly to where the body was buried.
He described that he had wrapped a towel around her head, shot her,
stuffed her head first into a sleeping bag, and buried her face down
with her head pointing toward the clearing. . . .

All of the above details of the offense, many of which could have
only been known by Appellant, were shown to be true.

**15**

(1989).


                              VI.


    Jacobs argues that the two special issues did not allow the

jury to take into account mitigating evidence that he was not the

triggerman.[13]  In Penry v. Lynaugh, 492 U.S. 302, 322-34 (1989), the

Court held that the deliberateness and future dangerousness special

issues violated the Eighth Amendment by failing to let the jury

"give effect" to mitigating evidence that the defendant suffered

from brain damage, was mentally retarded, and had a troubled

childhood.

    Jacobs's argument, based upon mitigating evidence of non-

triggerman status, is firmly foreclosed by precedent.  See Harris

v. Collins, 990 F.2d 185, 188-89 (5th Cir. 1993); Drew v. Collins,

964 F.2d 411, 421 (5th Cir. 1992), cert. denied, 113 S. Ct. 3044

_____

        [13] Jacobs makes three arguments that are, in essence, rephrasings of this
same contention.  First, he argues that the jury was not instructed that the "law
of parties" was not applicable at sentencing.  Second, he avers that the jury
would have automatically had to answer "yes" to the second part of the first
special issue))whether the defendant acted "with the reasonable expectation that
the death of the deceased or another would result."  Third, he contends that the
jury might have believed that the defendant's non-triggerman actions were
deliberate.  All three of these arguments are rephrasings of Jacobs's basic
thesis:  that the two special issues did not allow the jury to take into account
the possibility that a co-conspirator physically caused the death of the victim.

        Jacobs also argues that it was error for the state trial court not to
define the word "deliberately" in the first special issue.  We have squarely
rejected this claim.  See Nethery v. Collins, 993 F.2d 1154, 1162 & n.28 (5th
Cir. 1993).

        The federal district court held that Jacobs waived any challenge to the
special issue instructions because he did not make an objection to the state
trial court.  But because the Court of Criminal Appeals evaluated the claim on
its merits, Ex Parte Jacobs, 843 S.W.2d at 518-19, Jacobs's failure to object
does not waive his challenge.  We must therefore evaluate the claim on its
merits.  See Drew v. Collins, 964 F.2d 411, 420 (5th Cir. 1992), cert. denied,
113 S. Ct. 3044 (1993).

**16**

(1993); <u>Bridge v. Collins</u>, 963 F.2d 767, 770 (5th Cir. 1992). In <u>Bridge</u>, we held that a jury could give mitigating effect to evidence that the defendant's accomplice may have shot the victim. <u>Id.</u> The jurors could have concluded either that the defendant's conduct was not deliberate and therefore answered "no" to the first special issue or that the defendant would not be a future threat and answered "no" to the second special issue. <u>Id.</u>[14]


                              VII.

    Jacobs contends that the jury was unable to take into account other mitigating evidence when sentencing him. The other evidence includes:

> evidence of his troubled childhood; cooperation with the police; remorse; efforts to better his life by starting a successful auto repair business while on parole and educating himself while in prison; trustworthiness; love for his family and friends; and, that he was president of a prison group dedicated to benefiting charitable institutions and helping unwed mothers and abused children.

<u>Ex Parte Jacobs</u>, 843 S.W.2d at 520. The mitigating evidence falls into two groups: (1) evidence of Jacobs's troubled childhood and (2) evidence of remorse and favorable personality traits.

    Jacobs argues that the jury could not give effect to evidence of his troubled childhood. In <u>Penry</u>, the defendant argued that the jury was unable to consider mitigating evidence that he suffered from brain damage, was mentally retarded, and had a troubled

---

[14] <u>See</u> <u>Skillern v. Estelle</u>, 720 F.2d 839, 843 (5th Cir. 1983), <u>cert. denied</u>, 469 U.S. 493 (1984); <u>Johnson v. McCotter</u>, 804 F.2d 300 (5th Cir. 1986), <u>cert. denied</u>, 107 S. Ct. 1262 (1987).

**17**

childhood. The Court held that the first special issue on deliberateness did not adequately account for the possibility that Penry's mental retardation and history of child abuse might have diminished his moral culpability for his crime. 492 U.S. at 322-23. The Court also held that the second special issue failed to give full effect to the mitigating evidence of mental retardation and child abuse. Id. at 324. Such mitigating evidence could only be an aggravating factor, as it suggests that the jury should answer "yes" to the question of future dangerousness. Id. at 323-24.[15]

In Graham v. Collins, 113 S. Ct. 892 (1993), the Court held that the Texas special issues gave effect to evidence of a defendant's childhood that was "unstable" and "transient." Id. at 897, 902. The Graham Court distinguished Penry on the following grounds:

> Graham's evidence of transient upbringing and otherwise nonviolent character more closely resemble Jurek's [Jurek v. Texas, 428 U.S. 262 (1976)] evidence of age, employment history and familial ties than it does Penry's evidence of mental retardation and harsh physical abuse.

Id. at 902.

Jacobs had a troubled childhood like that of Graham, as opposed to a childhood rife with harsh physical abuse like that of Penry. In his brief, Jacobs describes the evidence of his troubled

---

[15] In response to Penry, the Texas Code of Criminal Procedure now instructs the jury that "in deliberating on the issues submitted under Subsection (b) of this article, it shall consider all evidence admitted at the guilt or innocence stage and the punishment stage, including evidence of the defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty." Tex. Code Crim. Proc. Ann. art. 37.071(2)(b) (effective Sept. 1, 1991) (Vernon Supp. 1993-94).

childhood as follows:

> Finally, evidence was presented showing that Mr. Jacobs had an unstable, troubled childhood. He never knew his mother, and has only vague memories of his father. His father left him to live alone with strangers when he was a small boy, and Mr. Jacobs never saw him again. Mr. Jacobs ended up living in several foster homes as a child, separated from his sister, parents, and all other family connections.

Thus, Jacobs's evidence of a troubled childhood is distinguishable from that in Penry.

We therefore reject Jacobs's contention that the Texas special issues do not account for mitigating evidence of his troubled childhood. In addition, Jacobs failed to present evidence of the effect his childhood had on him or of his reaction to his childhood. See Graham v. Collins, 950 F.2d 1009, 1033 (5th Cir. 1992) (en banc), aff'd, 113 S. Ct. 892 (1993). As for Jacobs's alleged positive character traits, a jury wishing to give effect to such traits could answer "no" to the second special issue regarding future dangerousness. Graham, 113 S. Ct. at 902 (various positive character traits); Franklin v. Lynaugh, 487 U.S. 164, 178 (1988) (clean prison record); Andrews v. Collins, 21 F.3d 612, 630 (5th Cir. 1994) (good relationship with wife).

## VIII.

Citing Enmund v. Florida, 458 U.S. 782 (1982), Jacobs argues that the Texas special issue questions did not allow the jury to take into account whether Jacobs killed, attempted to kill, or

intended that a killing take place.[16]   Jacobs's argument is foreclosed by precedent.  The first special issue satisfies the requirements of Enmund, even in cases where the defendant may have been found guilty of capital murder on the basis of the "law of the parties."   Andrews v. Collins, 21 F.3d 612, 630-31 (5th Cir. 1994).[17]


IX.

The state trial court instructed the jury that "[i]f ten (10) jurors or more vote "No" as to any Special Issue, then the answer of the Jury shall be "No" to that issue . . . ."  Citing Mills v. Maryland, 486 U.S. 367 (1988), Jacobs claims that the jury instruction violated the Constitution by creating a false need for a nearly unanimous response to the special issues.  The state trial court held that Jacobs's claim was procedurally barred because he did not object to the charge or request a special instruction and did not demonstrate egregious harm arising from his claimed constitutional violation.

Jacobs's claim is procedurally barred.  Federal review of a habeas claim is procedurally barred if the last state court to consider the claim expressly and unambiguously based its denial of

---

[16] In Enmund, the Court held that it was cruel and unusual punishment to impose the death penalty on a defendant "who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed."  458 U.S. at 797.

[17] See Skillern v. Estelle, 720 F.2d 839, 843 (5th Cir. 1983), cert. denied, 469 U.S. 493 (1984); Johnson v. McCotter, 804 F.2d 300 (5th Cir. 1986), cert. denied, 107 S. Ct. 1262 (1987).

relief on a state procedural bar.  <u>Harris v. Reed</u>, 489 U.S. 255, 265 (1989).  The state court's opinion must contain a "plain statement" that its decision rests upon adequate and independent state grounds.  <u>Id.</u> at 263-66.  Where a state court has explicitly relied upon a procedural bar, a state prisoner may not obtain federal habeas relief absent a showing of cause for the default and actual prejudice that is attributable to the default.  <u>Murray v. Carrier</u>, 477 U.S. 478, 485 (1986).  Jacobs has not made a showing of cause for default.  Therefore, we reject his claim.

Furthermore, Jacobs was not prejudiced by the state court's invocation of a procedural bar.  His substantive argument is meritless.  In <u>Mills</u>, the Supreme Court reversed a death sentence imposed under Maryland's capital punishment scheme because jury instructions may have precluded the jury from considering mitigating evidence unless all twelve jurors agreed on the existence of a particular circumstance supported by that evidence.  486 U.S. at 384.  The Court concluded that merely one juror could block consideration of the mitigating evidence and thus require the jury to impose the death penalty.  <u>Id.</u>  The Supreme Court has interpreting <u>Mills</u> to mean that "each juror [must] be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death."  <u>McKoy v. North Carolina</u>, 494 U.S. 433, 442-43 (1990).

The law in Texas is completely different from that in <u>Mills</u>.  The law in Texas provided as follows:

> (c)  The state must prove each issue submitted beyond a reasonable doubt, and the jury shall return a special

verdict of "yes" or "no" on each issue submitted.

(d)  The court shall charge the jury that:

(1)  it may not answer any issues "yes" unless it agrees unanimously; and

(2)  it may not answer any issue "no" unless 10 or more jurors agree.

TEX. CODE CRIM. PROC. ANN. art. 37.071 (Vernon 1981) (effective June 14, 1973).

The jury instructions substantially conform to the Texas law on death penalty special issues.  The state trial judge instructed that the jury may answer "Yes" to one of the special issues only if the entire jury unanimously determined that the answer should be "Yes."  The judge then instructed that if 10 or more jurors voted "No" as to any special answer, then the jury's vote should be "No." The judge further instructed that each juror was to make his or her decision independently.  Under the Texas system, all jurors can take into account any mitigating circumstance.  One juror cannot preclude the entire jury from considering a mitigating circum-stance.  Thus, Mills is inapplicable.

The Texas system allows an answer of "Yes" to a special issue if all jurors vote "Yes," and allows an answer of "No" if ten jurors vote "No."  Mills does not require a certain number of jurors to agree to impose the death penalty.


X.

Jacobs avers that the trial court erred by charging the jury at the guilt phase on a conspiracy theory of liability even though

the indictment contained no such charge.  We have held that "one who has been indicted as a principal may, on proper instructions, be convicted on evidence showing only that he aided and abetted the commission of the offense."  United States v. Robles-Pantoja, 887 F.2d 1250, 1255 (5th Cir. 1989) (citations omitted).  Similarly, it was not error for Jacobs to be indicted as a principal and then to be convicted under the "law of the parties."

XI.

During the sentencing phase of his trial, Jacobs told his counsel not to present any defense witnesses and not to make a closing argument.  Jacobs's counsel complied with these requests.  Jacobs now argues that the trial court erred by allowing him to represent himself without warning him of the dangers of proceeding without counsel.

A defendant wishing to represent himself must "be made aware of the dangers and disadvantages of self-representation, so that the record will establish that `he knows what he is doing and his choice is made with eyes open.'"  Faretta v. California, 422 U.S. 806, 835 (1975) (citation omitted).  The record shows that the district court fully informed Jacobs of the pitfalls of self-representation.  We therefore reject his argument.[18]

The application for CPC is DENIED.

---

[18] The parties hotly debate whether we should defer to the state court's factual findings.  Because Jacobs's argument are meritless even if no deference is accorded to the state court, we need not reach the issue of how much deference should be accorded to the state court's findings of fact.