JANUARY 2, 1995

No. 94–7010 (A–403). JACOBS v. SCOTT, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, INSTITUTIONAL DIVISION. C. A. 5th Cir. Application for stay of execution of sentence of death, presented to JUSTICE SCALIA, and by him referred to the Court, denied. Certiorari denied. JUSTICE BREYER would grant the application for stay of execution.

JUSTICE STEVENS, with whom JUSTICE GINSBURG joins, dissenting.

In my opinion, it is fundamentally unfair for the State of Texas to go forward with the execution of Jesse Dewayne Jacobs. The principal evidence supporting his conviction was a confession that was expressly and unequivocally disavowed, at a subsequent trial, by the same prosecutor who presented the case against Jacobs. That same prosecutor's office now insists that the State may constitutionally go forward and execute Jacobs. The injustice, in my view, is self-evident.

Jacobs was convicted of murdering a woman named Etta Urdiales. After his arrest, he gave a videotaped confession stating that he abducted the victim and fatally shot her in a wooded area. He led investigators to her body. At his trial, the State introduced this confession and relied heavily on it.

Jacobs, however, testified at trial that the confession was false. He claimed to have given the false confession because he believed it would lead to a death sentence, which he perceived to be preferable to the alternative of spending the rest of his life in jail. In

his trial testimony, Jacobs admitted kidnaping Urdiales, and taking her to an abandoned house where his sister, Bobbie Hogan, was waiting. But he denied shooting the victim. According to Jacobs' testimony, he left Urdiales in the house with his sister and then went outside and sat on the porch. He did not know Hogan was armed, or that she planned to kill Urdiales. Rather, he believed Hogan, who was romantically involved with Urdiales' estranged husband, wanted to scare the victim into giving up custody of her children. Jacobs testified that while he was waiting outside, Hogan shot Urdiales. When Jacobs entered the house, Hogan said that she did not mean to kill Urdiales. Jacobs then told Hogan to go home, said he would take care of things, and buried the victim's body.

The prosecution disputed Jacobs' trial testimony, arguing that "'[t]he simple fact of the matter is that Jesse Jacobs and Jesse Jacobs alone killed Etta Ann Urdiales.'" 31 F. 3d 1319, 1322, n. 6 (CA5 1994). The jury convicted Jacobs of capital murder and sentenced him to death.

Several months later, Hogan was tried in connection with the Urdiales killing. At this trial, the State abandoned its theory that Jacobs had shot Urdiales. It called Jacobs as a witness, vouched for his veracity, and, according to the Court of Appeals for the Fifth Circuit, "told the jury that the evidence revealed [through further] investigation cast doubt on Jacobs's conviction." *Ibid.* As described by the Court of Appeals:

> "[T]he prosecutor said that the state had been wrong in taking the position in Jacobs's trial that Jacobs had done the actual killing. The prosecutor stated that, after further investigation, he had determined that Hogan, not Jacobs, had killed the victim. The prosecution maintained that Jacobs did not know that Hogan had a gun. The state called Jacobs as a witness to testify that Hogan shot the victim." *Id.*, at 1322–1323 (footnotes omitted).

The prosecutor told the jury that he had "'changed my mind about what actually happened. . . . And I'm convinced that Jesse Jacobs is telling the truth when he says that Bobbie Hogan is the one that pulled the trigger.'" *Id.*, at 1322, n. 6. He also "claimed that Jacobs was telling the truth when he testified that he did not in any way anticipate that the victim would be shot." *Id.*, at

1323, n. 7. Several police officers testified at the sister's trial that portions of Jacobs' confession were untrue. *Id.*, at 1323, n. 6.

Despite these post-trial developments, the State of Texas now insists that it may constitutionally carry out Jacobs' death sentence. I find this course of events deeply troubling. If the prosecutor's statements at the Hogan trial were correct, then Jacobs is innocent of capital murder. Cf. *Herrera* v. *Collins*, 506 U. S. 390, 417 (1993) (discussing whether habeas relief is available to a death-row inmate who has advanced "a truly persuasive demonstration of 'actual innocence'"). Moreover, for a sovereign State represented by the same lawyer to take flatly inconsistent positions in two different cases—and to insist on the imposition of the death penalty after repudiating the factual basis for that sentence—surely raises a serious question of prosecutorial misconduct. In my opinion, it would be fundamentally unfair to execute a person on the basis of a factual determination that the State has formally disavowed.

Almost 60 years ago, we recognized that a prosecutor's knowing presentation of false testimony is "inconsistent with the rudimentary demands of justice." *Mooney* v. *Holohan*, 294 U. S. 103, 112 (1935). We have refined this principle over the years, finding a due process violation when a prosecutor fails to correct testimony he knows to be false, *Alcorta* v. *Texas*, 355 U. S. 28 (1957), even when the falsehood in the testimony goes only to the witness' credibility, *Napue* v. *Illinois*, 360 U. S. 264 (1959). See also *Giglio* v. *United States*, 405 U. S. 150 (1972) (new trial required when Government witness testified falsely on matters relating to credibility and the prosecutor who served as trial counsel should have been aware of the falsehood).

In *Durley* v. *Mayo*, 351 U. S. 277 (1956), we granted certiorari to consider whether due process was offended by a conviction which was later alleged to rest upon perjured testimony, despite the fact that the prosecutor did not know of the testimony's falsity at trial. Although the Court ultimately held that jurisdiction was lacking, and disposed of the case on that basis, four Justices would have reached the merits. Writing for the dissenters, Justice Douglas would have found a "clear" due process violation:

> "It is well settled that to obtain a conviction by the use of testimony known by the prosecution to be perjured offends

due process. *Mooney* v. *Holohan,* 294 U. S. 103; *Pyle* v. *Kansas,* 317 U. S. 213. While the petition did not allege that the prosecution knew that petitioner's codefendants were lying when they implicated petitioner, the State now knows that the testimony of the only witnesses against petitioner was false. No competent evidence remains to support the conviction. Deprivation of a hearing under these circumstances amounts in my opinion to a denial of due process of law." *Id.,* at 290–291.

See also *Sanders* v. *Sullivan,* 863 F. 2d 218 (CA2 1988); cf. *Hysler* v. *Florida,* 315 U. S. 411, 413 (1942) ("Mere recantation of testimony" does not justify voiding a conviction on due process grounds). Here, the facts are far stronger than in *Durley,* as the State itself has formally vouched for the credibility of Jacobs' recantation of his confession and police officers have testified, under oath, that parts of Jacobs' confession were false.

I have long believed that serious questions are raised "when the sovereign itself takes inconsistent positions in two separate criminal proceedings against two of its citizens." *United States* v. *Powers,* 467 F. 2d 1089, 1097 (CA7 1972) (Stevens, J., dissenting), cert. denied, 410 U. S. 983 (1973); see also *United States* v. *Ott,* 489 F. 2d 872 (CA7 1973). The "heightened need for reliability" in capital cases, see *Caldwell* v. *Mississippi,* 472 U. S. 320, 323 (1985) (internal quotation marks omitted), only underscores the gravity of those questions in the circumstances of this case. At a minimum, Jacobs' execution should be stayed so that we may carefully consider his claims by way of our ordinary procedure respecting petitions for certiorari.

I respectfully dissent from the order denying the application for a stay of execution.